## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| In re: | Chapter  11 |
| **AXCESS MEDICAL IMAGING CORPORATION,** | **Case No. 8:09-bk-12180-CED** |
| **US IMAGING HOLDING, LLC,** | **Case No. 8:09-bk-12181-CED** |
| **U.S. IMAGING CENTER CORP., LLC,** | **Case No. 8:09-bk-12182-CED** |
| **AXCESS DIAGNOSTICS BRADENTON, LLC,** | **Case No. 8:09-bk-12183-CED** |
| **AXCESS DIAGNOSTICS SARASOTA, LLC,** | **Case No. 8:09-bk-12184-CED** |
| **CLEARWATER RESOURCES, INC.,** | **Case No. 8:09-bk-12186-CED** |
| **BRADENTON RESOURCES, INC.,** | **Case No. 8:09-bk-12187-CED** |
| **MRI-SOUTH UMBERTON, INC.,** | **Case No. 8:09-bk-12189-CED** |
| **MORGAN MEDICAL CORPORATION,** | **Case No. 8:09-bk-12190-CED** |
| **CHARLOTTE RESOURCES, INC.,** | **Case No. 8:09-bk-12192-CED** |
| **JACKSONVILLE RESOURCES, INC.,** | **Case No. 8:09-bk-12194-CED** |
| **AXCESS MANAGEMENT GROUP, LLC,** | **Case No. 8:09-bk-12197-CED** |
| **Debtors.** | *Jointly Administered* |
| _____/ | *Case No. 8:09-bk-12180-CED* |

### ORDER GRANTING DEBTORS' MOTION FOR ORDER AUTHORIZING
### THE SALE OF SUBSTANTIALLY ALL OF THEIR ASSETS PURSUANT TO 11 U.S.C. § 363,
### FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES, AS SUPPLEMENTED

This cause came on for a sale auction and a hearing before the Court on January 15, 2010, at

9:00 a.m. (the "**Sale Hearing**"), upon (i) the Debtors' Motion for Order Authorizing the Sale of

Substantially All of Their Assets to Altamonte Springs Diagnostic Imaging, Inc. Pursuant to 11

U.S.C. § 363, Free and Clear of All Liens, Claims and Encumbrances [Doc. No. 374] (the

"**Motion**"), and (ii) the First Supplement to Debtors' Motion for Order Authorizing the Sale of

Substantially All of Their Assets to Altamonte Springs Diagnostic Imaging, Inc. Pursuant to 11 U.S.C. § 363, Free and Clear of All Liens, Claims and Encumbrances [Doc. No. 414] (the "**First Supplement**" and together with the Motion hereinafter referred to, collectively, as the "**Sale Motion**").[1]

The Court finds that the Debtors entered into an Asset Purchase Agreement, dated as of November 13, 2009 ( the "**Purchase Agreement**"), with Altamonte Springs Diagnostic Imaging, Inc. ("**ASDI**"), which provided for the sale by the Debtors, and the purchase by ASDI, pursuant to 11 U.S.C. § 363, of substantially all of the assets (the "**Assets**") of the Debtors for $5,000,000 in cash, plus the assumption by ASDI of certain liabilities of the Debtors (as more particularly described in Section 1.7 of the Purchase Agreement), free and clear of any and all claims (including "claims" as defined in Section 101(5) of the Bankruptcy Code), mortgages, pledges, liens, security interests, interests, charges, encumbrances, setoffs, recoupments, cure claims, liabilities, debts, indebtedness, costs, damages, judgments or obligations of any character whatsoever and whenever arising, either before or after the Petition Date (collectively, the "**Encumbrances**"), with such Encumbrances to attach to the proceeds of the sale as further described below in this Order.

In connection with the proposed sale by the Debtors of their Assets, on November 30, 2009, the Court entered its Order Granting Debtors' Emergency Motion for Entry of an Order (I) Approving Bidding Procedures in Connection with the Sale of Substantially All of Their Assets, (II) Establishing Procedures for the Assumption and/or Assignment by the Debtors of Certain Executory Contracts and Unexpired Leases, (III) Approving Minimum Overbid Amount and a Break-Up Fee,

---

[1]    Unless otherwise defined herein, capitalized terms used herein shall have the meaning ascribed to such terms in the Sale Motion.

(IV) Approving Form and Manner of Notice of Bidding Procedures, and (V) Setting Objection Deadlines [Doc. No. 365] (the "**Bid Procedures Order**").  In the Bid Procedures Order, the Court established (i) a deadline of 12:00 p.m. (Eastern Standard Time) on January 11, 2010 for the filing of any and all objections to the Motion or the sale of the Assets to ASDI (the "**Sale Objection Deadline**"), (ii) a deadline of 12:00 p.m. (Eastern Standard Time) on January 11, 2010 for the submission of any competing bids for the Assets (the "**Bid Deadline**"), and (iii) a deadline of 5:00 p.m. (Eastern Standard Time) on January 13, 2010 for the submission of any credit bids for the Assets (the "**Credit Bid Deadline**") by either Amegy Bank National Association ("**Amegy**") or HCI Secured Medical Receivables Special Purpose Corporation ("**HCI**").  The Bid Procedures Order also described the procedures for the submission of competing bids (the "**Competing Bid Procedures**") for the purchase of all or any of the Debtors' Assets.

On December 1, 2009, the Bid Procedures Order (containing notice of the sale to ASDI, the Sale Objection Deadline, the Bid Deadline, the Credit Bid Deadline, the Competing Bid Procedures, and the Sale Hearing) was mailed by the Debtors to (i) all parties set forth on the Local Rule 1007(d) Parties in Interest List for these cases, (ii) all Potential Bidders (as defined below), (iii) all landlords who are party to the Designated Leases (as defined below), and (iv) counsel to ASDI [Doc. No. 367]. On December 2, 2009, the Court mailed the Bid Procedures Order to all creditors of the Debtors listed on the Court's mailing matrices for these cases, including the Equipment Companies (as defined below) [Doc. No. 369].

On December 4, 2009, the Debtors filed the Motion with the Court.  The Motion was served upon (i) all parties set forth on the Local Rule 1007(d) Parties in Interest List for these cases, (ii) all creditors of the Debtors, (iii) all Potential Bidders, and (iv) all landlords who are party to the Designated Leases.  Certificates of service have been filed in the Court's records for these cases

3

regarding such service.  The Purchase Agreement (including all Schedules thereto) was attached as Exhibit A to the Motion and has been on file with the Court since December 4, 2009 and available for inspection and review by all creditors and parties in interest.

Pursuant to the terms of the Motion and the Purchase Agreement, the Assets to be sold to, and purchased by, ASDI or any winning bidder at the Sale Hearing included, among other things, the Business of the Debtors as a going concern, the fixed assets described in Schedule 1.1(c) attached to the Purchase Agreement (which included a listing of major medical equipment located at the Debtors' facilities), all inventories and equipment including without limitation all magnetic imaging machines and ancillary and auxiliary equipment used or useable in connection with the Business, the accounts receivable of the Debtors, and the non-residential real property leases for the Debtors' property locations identified on Schedule 1.1(m) attached to the Purchase Agreement (the "**Designated Leases**").

On December 4, 2009, the Debtors also filed their Motion for Authority to Assume and/or Assign Certain Executory Contracts and Unexpired Leases to Altamonte Springs Diagnostic Imaging, Inc. Free and Clear of All Liens, Claims and Encumbrances [Doc. No. 375] (the "**Contracts Motion**").  The Contracts Motion seeks an order from the Court authorizing the Debtors to assume and/or assign the Designated Leases to ASDI or any winning bidder at the Sale Hearing. The Contracts Motion also came on for consideration at the Sale Hearing, and the Court will enter a separate order on the relief requested in the Contracts Motion.

On January 6, 2010, the Debtors filed the First Supplement with the Court.  Paragraph 9 of the First Supplement provided as follows:

"As expressly provided on Schedule 1.1(c) attached to the Purchase Agreement and in Section 1.1(d) of the Purchase Agreement, the Fixed Assets and the Other Assets include all of the major medical equipment utilized by the Debtors at their facilities.  For the

4

avoidance of doubt, the Debtors are attaching as Exhibit A to this First Supplement a more detailed listing of the major medical equipment owned by the Debtors and intended to be sold to the Purchaser pursuant to the Purchase Agreement. For purposes of this First Supplement, the Fixed Assets, the Other Assets and the equipment listed on Exhibit A attached to this First Supplement shall hereinafter be collectively referred to as the "**Identified Equipment**.""

The Debtors further stated in Paragraph 12 of the First Supplement as follows:

"At the closing (the "**Closing**") under the Purchase Agreement, the Debtors are required to execute a bill of sale transferring to the Purchaser all right, title and interest of the Debtors in the Identified Equipment. The Debtors assert that they own title to all of the Identified Equipment to be transferred to the Purchaser under the Purchase Agreement, but believe it is necessary to identify specifically certain items of such equipment (as set forth in paragraphs 7-9 above) in this First Supplement in order to avoid any dispute, and put all parties on notice that the Debtors contend, that the Identified Equipment constitute Assets owned by the Debtors which the Debtors will transfer to the Purchaser at the Closing. Furthermore, it is the Debtors' position that none of the Identified Equipment is subject to a "true lease." To the extent that any of the Identified Equipment is described in any alleged executory contract or lease to which the Debtors are a party, the Debtors will not be seeking to assume and assign any such alleged executory contract or lease to the Purchaser under the Assumed Contracts Motion."

The First Supplement also provided that the Debtors would be transferring the Identified Equipment (for purposes of this Order, all of the major medical equipment owned or used by the Debtors at their facilities, including the major medical equipment identified in the Motion and in the First Supplement, shall hereinafter be referred to, collectively, as the "**Identified Equipment**") to the Purchaser at the Closing, free and clear of any and all Encumbrances of any creditors or claimants of any kind whatsoever, with any such Encumbrances to attach to the proceeds from the sale of the Identified Equipment to the same extent, validity and priority as existed on the Identified Equipment as of the Petition Date. The First Supplement further provided that all objections to the relief requested in the First Supplement must be filed with the Court by no later than the Sale Objection Deadline. The First Supplement was served, by United States first class mail, on (i) all parties set forth on the Local Rule 1007(d) Parties in Interest List for these cases, and (ii) all Potential Bidders.

In addition, the First Supplement was served on January 6, 2010, by either CM/ECF transmission or facsimile transmission, on the following parties or their counsel: Great America Leasing Corporation, First Federal Leasing, Inc., IBM Credit, LLC, Leaf Funding, Inc., General Electric Capital Corporation ("**GECC**"), Banc of America Leasing & Capital, LLC ("**Banc of America**"), US Bancorp Manifest Funding Services, Philips Medical Capital, LLC, and Carestream Health (hereinafter, collectively, the "**Equipment Companies**"). A certificate of service has been filed in the Court's records for these cases regarding such service [Doc. No. 414]. No objections to the relief requested in the Motion or in the First Supplement were filed with the Court by any of the Equipment Companies, either by the Sale Objection Deadline or otherwise prior to the Sale Hearing.

The Court finds that the Competing Bid Procedures have been duly complied with in all respects by the Debtors. The Court finds that the implementation and conduct of the Competing Bid Procedures were fair and reasonable under the circumstances and reasonably calculated to achieve the highest and best price for the Assets for the benefit of the Debtors' estates and creditors. The Court finds that the Bid Procedures Order, the Motion (including the Purchase Agreement and all Schedules thereto), the Contracts Motion and the First Supplement were served on all parties that were notified pre-petition by the Debtors or their agents of the potential opportunity to acquire the Assets and on all parties that had expressed interest to the Debtors or their agents in acquiring the Assets (collectively, the "**Potential Bidders**"), in order to achieve selection of the highest and best offer for the sale of the Assets.

The Court finds that notice of the Motion, the First Supplement, the Sale Objection Deadline, the Bid Deadline, the Credit Bid Deadline, the Competing Bid Procedures, and the Sale Hearing to creditors and other parties in interest, including the Potential Bidders and the Equipment Companies, was adequate and sufficient, that it complied in all respects with the Bankruptcy Code, the Federal

Rules of Bankruptcy Procedure, and the Local Rules of this Court and otherwise satisfies the requirements of due process. The Court further finds that appropriate certificates of mailing and service have been filed in the Court's records for these cases regarding such notice.

At the start of the Sale Hearing, and prior to the commencement of the auction, counsel to the Debtors read into the record the material terms of each of the bids received for the purchase of all or any of the Debtors' Assets (each, a "**Bid**" and collectively the "**Bids**").  Bids for the purchase of certain Assets of the Debtors (i.e., not substantially all of the Debtors' Assets) were received from North Brevard Medical Support, Inc. ("**North Brevard**") [Doc. No. 436], KEM Associates, LLP [Doc. No. 437], Coastal Orthopedics & Sports Medicine of Southwest Florida, P.A. [Doc. No. 438], Spinecare Associates, L.L.C. ("**Spinecare**") [Doc. No. 439], Partners Imaging Holdings LLC ("**Partners Imaging**") [Doc. No. 441], Hilton Head Imaging, Inc. and its affiliates [Doc. No. 442 and Doc. No. 452], Health Capital Investors, Inc. [Doc. No. 447], Amegy [Doc. No. 448], and HCI [Doc. No. 449].  A summary of these Bids is set forth in the Notice of Filing of Summary of Bids Received by the Debtors for the Purchase of Certain Assets of the Debtors (Not Substantially All of the Assets of the Debtors) [Doc. No. 450].  Bids for the purchase of substantially all of the Debtors' Assets (the "**Global Bids**") were received from ASDI [Doc. No. 374], Partners Imaging [Doc. No. 441], and Coastal Imaging Holdings, LLC [Doc. No. 444].  Counsel for the Debtors also stated for the record that none of the parties submitting Global Bids (including ASDI) had filed with the Court, or otherwise produced, a binding loan commitment or other financial information demonstrating their financial ability to close on their respective Global Bids.  A summary of the Global Bids is set forth in the Notice of Filing of Summary of Bids Received by the Debtors for the Purchase of Substantially All of the Assets of the Debtors [Doc. No. 451].  At the Sale Hearing, each of the

parties submitting Bids confirmed for the record the terms of their Bids, which terms were substantially the same as the terms read into the record by counsel to the Debtors.

Objections to the Sale Motion (hereinafter referred to individually as an "**Objection**" and collectively as the "**Objections**") were timely filed with the Court by the following parties (collectively, the "**Objecting Parties**"):

    (a)    Fred Ricciardello, as Personal Representative of the Estate of Steven Ricciardello (the "**Ricciardello Estate**") [Doc. No. 402], which Objection asserted that the Ricciardello Estate possessed a judgment lien as of the Petition Date against the assets of Axcess Diagnostics Bradenton, LLC ("**Axcess Bradenton**") and that such judgment lien should attach to the proceeds from the sale of the assets of Axcess Bradenton;

    (b)    HCI [Doc. No. 428], which Objection asserted numerous objections to the Motion, the Competing Bid Procedures and the sale of the Assets to ASDI; and

    (c)    Amegy [Doc. No. 429], which Objection asserted that Amegy's credit bid rights under Section 363(k) of the Bankruptcy Code could not be limited or hindered in connection with the Sale Hearing.

At the Sale Hearing, counsel to the Debtors and counsel to the Ricciardello Estate announced that the Objection filed by the Ricciardello Estate had been resolved as follows: the judgment lien asserted by the Ricciardello Estate would attach to the proceeds from the sale of the assets of Axcess Bradenton to the same extent, validity and priority as existed on such assets as of the Petition Date, and the Debtors, the Committee, any representative appointed for the Debtors' estates under Section 1123 of the Bankruptcy Code, or any subsequently appointed trustee in these cases would reserve all rights, claims and defenses against the Ricciardello Estate, including the ability to challenge the extent, validity, priority or perfection of such judgment lien.  As a result of the Bid made by HCI at the auction and accepted by the Court as described further below, HCI withdrew its Objection at the Sale Hearing. As a result of the agreement reached between Amegy, the Debtors and the Committee

at the auction as to the allowance of Amegy's claims against the Axcess Debtors as described further below, Amegy withdrew its Objection at the Sale Hearing.

At the Sale Hearing, and prior to the commencement of the auction, counsel for the Debtors stated for the record that the Motion, the Purchase Agreement (including all Schedules thereto), and the First Supplement expressly provided for the sale of all of the Identified Equipment to ASDI or any winning bidder at the Sale Hearing. Counsel for the Debtors further stated that it was the Debtors' position that (i) the Debtors owned all of the Identified Equipment, (ii) the documents governing the Identified Equipment were not "true leases," but were merely disguised financing arrangements, and (iii) the Debtors had the absolute right to transfer good and valid title to and ownership of the Identified Equipment to ASDI or any winning bidder at the Sale Hearing. Counsel for the Debtors also stated that to the extent any of the Equipment Companies claimed a lien on the Identified Equipment, any such lien would attach to the proceeds from the sale of such Identified Equipment to the same extent, validity and priority as existed on such Identified Equipment as of the Petition Date, and the Debtors, the Committee, any representative appointed for the Debtors' estates under Section 1123 of the Bankruptcy Code, or any subsequently appointed trustee in these cases would reserve all rights, claims and defenses against the Equipment Companies, including the ability to challenge the extent, validity, priority or perfection of any such liens. It was also noted for the record that none of the Equipment Companies (including GECC and Banc of America, who were represented by counsel at the Sale Hearing) had filed objections to the relief requested in the Motion or in the First Supplement, either by the Sale Objection Deadline or otherwise prior to the Sale Hearing. In addition, neither GECC nor Banc of America objected at the Sale Hearing at the time of the placement of the foregoing statements on the record by counsel for the Debtors.

9

Following all of the foregoing, the Court received comments regarding certain procedures for the auction of all and portions of the Debtors' Assets. Immediately prior to the commencement of the auction, another attorney for GECC (appearing by telephone) raised various untimely oral objections to the sale by the Debtors of certain items of the Identified Equipment located at the Debtors' Venice and Bradenton, Florida facilities, including that the documents governing such items of Identified Equipment constituted "true leases" (the "**GECC Objection**"). Based on the record before the Court, the Court found that (i) the Debtors could transfer at closing good and valid title to and ownership of the Identified Equipment to ASDI or any winning bidder at the Sale Hearing, and (ii) any and all claims of GECC would attach to the proceeds from the sale of the applicable Identified Equipment to the same extent, validity and priority as existed on such Identified Equipment as of the Petition Date, and the Debtors, the Committee, any representative appointed for the Debtors' estates under Section 1123 of the Bankruptcy Code, or any subsequently appointed trustee in these cases would reserve all rights, claims and defenses against GECC, including the ability to challenge the extent, validity, priority or perfection of any such liens. Based on the foregoing and for the other reasons announced on the record by the Court at the Sale Hearing, the GECC Objection is overruled in all respects.

Thereafter, the Court conducted an extensive and lengthy auction for the sale of all and any portion of the Debtors' Assets with the full opportunity for all parties submitting Bids to participate in the auction. During the course of the auction, Douglas Badertscher, the Chief Restructuring Officer of the Debtors, testified that the value of the accounts receivable owned by Clearwater Resources, Inc., Bradenton Resources, Inc., MRI-South Umberton, Inc., Morgan Medical Corporation, Charlotte Resources, Inc., and Jacksonville Resources, Inc. (collectively, the "**MRI Debtors**") was $1,000,000. All parties present at the Sale Hearing were given the opportunity to

cross-examine Mr. Badertscher. Based on the testimony of Mr. Badertscher and the other evidence presented at the Sale Hearing, the Court ruled that, for purposes of valuing offers at the auction, the accounts receivable owned by the MRI Debtors should be valued at $1,000,000.

At the Sale Hearing, the offer of ASDI as set forth in the Purchase Agreement was not selected by the Court as the highest and best offer for the Debtors' Assets. Instead, for the reasons announced on the record at the Sale Hearing and based on the recommendations made by the Debtors and the Committee as to the highest and best offer received for the Debtors' Assets, the Court found that the Debtors' decision to retain and collect out the accounts receivable owned by the MRI Debtors (which were valued at $1,000,000 for the reasons described above) and Axcess Management Group, LLC plus the combined offer (the "**Combined Offer**") from Partners Imaging, North Brevard, Spinecare, and HCI as set forth below was the highest and best offer for the Debtors' Assets. The Combined Offer consisted of the following:

(1)    the offer of Partners Imaging to purchase, for a cash purchase price of $5,275,000, substantially all of the assets (excluding accounts receivable) of (i) U.S. Imaging Center Corp., LLC ("**Axcess Venice**"), (ii) Axcess Bradenton, (iii) Axcess Diagnostics Sarasota, LLC ("**Axcess Sarasota**"), (iv) Morgan Medical Corporation, but only with respect to the assets of Naples MRI & CT Center located in Naples, Florida, and (v) Charlotte Resources Inc. (the "**Partners Imaging Offer**"); and

(2)    the offer of North Brevard to purchase, for a cash purchase price of $625,000, substantially all of the assets (excluding accounts receivable) of Morgan Medical Corporation, but only with respect to the assets of MRI of North Brevard located in Titusville, Florida (the "**North Brevard Offer**"); and

(3)    the offer of Spinecare to purchase, for a cash purchase price of $150,000, substantially all of the assets (excluding accounts receivable) of Clearwater Resources, Inc. (the "**Spinecare Offer**"); and

(4)    the offer of HCI to purchase, for a cash purchase price of $1,250,000 subject to adjustment as described below (the "**HCI Purchase Price**"), all of the accounts receivable, related books and records and other conveyed property of Axcess Venice, Axcess Bradenton and Axcess Sarasota (collectively, the "**Axcess Debtors**"), and to release all of the claims of HCI and its affiliates against the Debtors, including but

11

not limited to the proofs of claim filed by HCI in these cases for a secured claim in the amount of $339,573.31 (the "**HCI Offer**").

For purposes of this Order, Partners Imaging, North Brevard, Spinecare and HCI will hereinafter be referred to, collectively, as the "**Purchasers**."

As part of the Combined Offer, each of the Purchasers agreed to close on the above transactions under its respective asset purchase agreement filed with the Court and as modified on the record at the Sale Hearing and in this Order (as so modified, hereinafter referred to, individually, as a "**Modified Bidder Agreement**" and, collectively, as the "**Modified Bidder Agreements**"), with such closing (the "**Modified Closing**") to occur by no later than thirty (30) days following the date of the Sale Hearing, or by no later than February 14, 2010 or the next succeeding business day on which banks in Tampa, Florida are open for business (the "**Modified Closing Date**").  Each of the Purchasers further agreed that there would be no contingencies to its obligation to close under its Modified Bidder Agreement.  Each of the Purchasers also agreed to provide its Modified Bidder Agreement to counsel to the Debtors and counsel to the Committee in advance of the Modified Closing Date.

With respect to the Partners Imaging Offer, Partners Imaging agreed to increase its existing deposit with the Debtors' counsel, Stichter, Riedel, Blain & Prosser, P.A. ("**SRBP**"), from $50,000 to $500,000 and to deliver the additional sum of $450,000 to SRBP by no later than January 22, 2010.  Partners Imaging also agreed that its total deposit of $500,000 (the "**Partners Imaging Deposit**") would be non-refundable to Partners Imaging in the event Partners Imaging failed to close under the Partners Imaging Offer by the Modified Closing Date and, in such event, SRBP, without further order of the Court, could disburse the Partners Imaging Deposit to the Debtors.  Notwithstanding the immediately preceding sentence, Partners Imaging would receive a refund of the Partners Imaging Deposit if Partners Imaging was capable of closing under the Partners Imaging Offer by the Modified Closing Date and the

12

Debtors decided not to close with Partners Imaging because one or more of the other Purchasers were not able to close under their respective Modified Bidder Agreements; provided, however, if Partners Imaging tenders its Purchase Price and closing documents on or before the Modified Closing Date, the Debtors shall close with Partners Imaging under the Partners Imaging Offer whether or not one or more of the other Purchasers are able to close under their respective Modified Bidder Agreements.

With respect to the North Brevard Offer, North Brevard agreed that $5,000 of its existing deposit with SRBP of $50,000 (the "**North Brevard Deposit**") would be non-refundable to North Brevard in the event North Brevard failed to close under the North Brevard Offer by the Modified Closing Date and, in such event, SRBP, without further order of the Court, could disburse $5,000 of the North Brevard Deposit to the Debtors and $45,000 of the North Brevard Deposit to North Brevard. Notwithstanding the immediately preceding sentence, North Brevard would receive a refund of the $5,000 amount if North Brevard was capable of closing under the North Brevard Offer by the Modified Closing Date and the Debtors decided not to close with North Brevard because one or more of the other Purchasers were not able to close under their respective Modified Bidder Agreements.

With respect to the Spinecare Offer, Spinecare agreed that its existing deposit with SRBP of $1,500 (the "**Spinecare Deposit**") would be non-refundable to Spinecare in the event Spinecare failed to close under the Spinecare Offer by the Modified Closing Date and, in such event, SRBP, without further order of the Court, could disburse the Spinecare Deposit to the Debtors. Notwithstanding the immediately preceding sentence, Spinecare would receive a refund of the Spinecare Deposit if Spinecare was capable of closing under the Spinecare Offer by the Modified Closing Date and the Debtors decided not to close with Spinecare because one or more of the other Purchasers were not able to close under their respective Modified Bidder Agreements.

With respect to the HCI Offer, HCI agreed to deposit the sum of $250,000 (the "**HCI Deposit**") with SRBP by no later than January 22, 2010.  HCI also agreed that the HCI Deposit would be non-refundable to HCI in the event HCI failed to close under the HCI Offer by the Modified Closing Date and, in such event, SRBP, without further order of the Court, could disburse the HCI Deposit to the Debtors.  Notwithstanding the immediately preceding sentence, HCI would receive a refund of the HCI Deposit if HCI was capable of closing under the HCI Offer by the Modified Closing Date and the Debtors decided not to close with HCI because one or more of the other Purchasers were not able to close under their respective Modified Bidder Agreements.  With respect to the HCI Offer, the Debtors expressly reserved the right to not separately close the HCI Offer if Partners Imaging did not close under the Partners Imaging Offer, since the accounts receivable of the Axcess Debtors would be needed by the Debtors in such instance to continuing operating their businesses.

The Debtors' counsel also announced on the record that the following additional terms and conditions were applicable to the HCI Offer and would be included in this Order or in the Modified Bidder Agreement between HCI and the Axcess Debtors: (i) the assets to be purchased by HCI consisted of all of the accounts receivable, related books and records and other conveyed property of the Axcess Debtors, as more specifically described in HCI's written asset purchase agreement filed with the Court (collectively, the "**HCI Purchased Assets**"), (ii) the HCI Purchased Assets would be sold by the Axcess Debtors to HCI on an "AS IS" basis with no representations or warranties of any kind by the Axcess Debtors, (iii) the final purchase price to be paid by HCI for the HCI Purchased Assets would be subject to adjustment based on the value of the aggregate dollar amount of the accounts receivable of the Axcess Debtors on the Modified Closing Date (i.e., services rendered by the Axcess Debtors through the Modified Closing Date) as compared to the value of the aggregate dollar amount of the accounts receivable of the Axcess Debtors on the January 2, 2010 weekly report

14

prepared by the Debtors (which was $2,816,325), with any adjustment upwards of such value to mean an increase in the HCI Purchase Price and any adjustment downwards of such value to mean a decrease in the HCI Purchase Price, in each case as determined in accordance with the formula described in HCI's written asset purchase agreement filed with the Court, (iv) Gottlieb & Associates and any other third party billing and collection agent or data service providers having possession of books, records and other information, electronic or otherwise, pertaining to the HCI Purchased Assets would be ordered to turn over such books, records and other information to HCI, (v) the Debtors and Partners Imaging would cooperate with HCI in providing access to any books and records pertaining to the HCI Purchased Assets in the possession of any such party, (vi) HCI would pay the reasonable fees and costs incurred in connection with obtaining copies or originals of any of the foregoing books, records and other information requested from the Debtors or any third parties, (vii) at the Modified Closing with HCI, HCI would deliver the appropriate documents releasing its liens and claims against the Debtors, and (viii) the pending adversary proceeding against HCI would be dismissed, with prejudice, in consideration of the HCI Offer.

As stated on the record at the Sale Hearing, the Debtors, in their discretion, are authorized to close one or all of the transactions comprising the Combined Offer, subject to the closing requirement above as to Partners Imaging through the Modified Closing Date. In addition, in this regard, in the event that HCI refuses to close the HCI Offer, the Debtors are further authorized, in their discretion, to retain and collect out the accounts receivable owned by the Axcess Debtors and also close one or all of the Partners Imaging Offer, the North Brevard Offer and the Spinecare Offer. The Court also finds that the Excluded Assets (as defined in the Purchase Agreement), including but not limited to all cash and all causes of action under Chapter 5 of the Bankruptcy Code, are being retained by the Debtors, and none of

the assets of Bradenton Resources, Inc., Jacksonville Resources, Inc., or MRI-South Umberton, Inc. are being sold to any of the Purchasers or otherwise pursuant to this Order.

Counsel for the Debtors and counsel for Amegy announced on the record that the parties (including the Committee) had reached an agreement for Amegy to have an allowed secured claim of $1,200,000 against the Axcess Debtors (the "**Amegy Allowed Claim**"), and that Amegy would waive any further claims against the Debtors or their estates, including any deficiency claims. The Amegy Allowed Claim would be paid from the first $1,200,000 of proceeds received from the sale or collection of the accounts receivable of the Axcess Debtors and, if such proceeds were insufficient to pay the Amegy Allowed Claim in full, the unpaid balance would be paid from the proceeds received from the collection of the accounts receivable of the MRI Debtors or the sale of the Assets to Partners Imaging; provided, however, that notwithstanding anything to the contrary contained in this Order, Amegy would be paid $1,200,000 in cash by no later than two (2) business days following the Modified Closing Date. Amegy also agreed that, upon payment in full of the Amegy Allowed Claim, Amegy would withdraw its proofs of claim filed against the Debtors and execute and file any termination statements or releases of liens with respect to any recorded financing statements or security interests against the Debtors.

The Court finds that, based upon the entire record:

(a)    The Debtors have advanced sound and sufficient business reasons and it is a reasonable exercise of the Debtors' business judgment pursuant to Section 363 of the Bankruptcy Code to sell their Assets to the Purchasers, in accordance with the terms of the Combined Offer and the Modified Bidder Agreements. The sale to the Purchasers is further justified by the compelling circumstances described in the Sale Motion and the representations and proffers offered in support of the Sale Motion at the Sale Hearing and at previous hearings before this Court.

(b)    The Combined Offer and the Modified Bidder Agreements resulted from an extensive search and marketing process and good faith arm's-length negotiations. None of the Purchasers is an affiliate of the Debtors under 11 U.S.C. §101(2) or an insider of the Debtors under 11 U.S.C. §101(31).

(c)     Pursuant to the terms of the Combined Offer and the Modified Bidder Agreements, the Debtors will be relieved of significant liabilities thus reducing potential claims against the Debtors and their estates.

(d)     The Debtors and the Purchasers have each acted in good faith and without collusion or fraud in connection with the preparation, negotiation and/or execution of the Combined Offer and the Modified Bidder Agreements, the subject matter of the Sale Motion and this Order, the auction, and the implementation of the Bid Procedures Order. Without limiting the foregoing, the Combined Offer and the Modified Bidder Agreements have been negotiated in good faith, at arm's-length, and not by any means forbidden by law. The Court specifically finds that each of the Purchasers has acted in good faith in pursuing and closing the transactions contemplated under the Combined Offer and the Modified Bidder Agreements for purposes of Section 363(m) of the Bankruptcy Code or otherwise. Neither the Debtors nor the Purchasers have engaged in any conduct that would cause or permit the Combined Offer or the Modified Bidder Agreements to be avoided under Section 363(n) of the Bankruptcy Code.

(e)     The consideration provided by the Purchasers for the purchase of the Debtors' Assets pursuant to the Modified Bidder Agreements, plus the Debtors' collection of the accounts receivable owned by the MRI Debtors, exceeds what the Debtors would be able to realize in a liquidation of such Assets, represents fair and adequate consideration for such Assets, and will provide a meaningful distribution to creditors of the Debtors.

(f)     The Debtors have articulated good and sufficient business justifications for the sale to the Purchasers pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code.

(g)     The sale to the Purchasers satisfies one or more of the requirements of Section 363(f) of the Bankruptcy Code as to all secured creditors of the Debtors.

(h)     The offer evidenced by the Combined Offer and the Modified Bidder Agreements together with the Debtors' decision to retain and collect the accounts receivable owned by the MRI Debtors constitutes the highest and best offer for the Debtors' Assets.

(i)     The relief requested in the Sale Motion is a necessary and appropriate step toward enabling the Debtors to successfully conclude these Chapter 11 cases as part of a plan of reorganization or liquidation.

(j)     The sale of the Debtors' Assets to the Purchasers pursuant to the Combined Offer and the Modified Bidder Agreements is in the best interests of the Debtors, their creditors and estates and all parties in interest.

The Court considered the Sale Motion, together with the record and the arguments of counsel

at the Sale Hearing and throughout these Chapter 11 cases, and the testimony of Mr. Badertscher at

the Sale Hearing and the proffers of counsel, and being otherwise duly advised in the premises, and

for the reasons announced on the record at the Sale Hearing, finds that the relief requested in the

Sale Motion is necessary and appropriate and is in the best interests of the Debtors, their creditors

and estates and all parties in interest, and that the Sale Motion is well taken and shall be granted in

accordance with the terms and conditions set forth herein.  Accordingly, it is

**ORDERED**:

1.      The Sale Motion is GRANTED to the extent set forth hereinbelow.

2.      The findings of fact set forth above in this Order be, and the same hereby are, ratified and

adopted as findings of this Court and are incorporated herein.  To the extent any of the findings of fact

set forth herein are deemed to be conclusions of law, then such findings are hereby confirmed as

conclusions of law.

3.      The offers by the Purchasers comprising the Combined Offer, and to be included in

their respective Modified Bidder Agreements, to purchase the Debtors' Assets are the highest and

best offers for the purchase of those Assets and represent fair and adequate consideration for those

Assets.

4.      The form and substance of the Modified Bidder Agreements and the transactions

contemplated thereby are hereby approved in all respects.  After the date of entry of this Order, the

Debtors and the Purchasers may enter into any non-material amendment or modification to the

respective Modified Bidder Agreements that is not adverse to the Debtors' estates without the need

of further notice and hearing or Court order.

5.      The execution, delivery and performance of the Modified Bidder Agreements by the

Debtors are hereby ratified and authorized in all respects.

6.      Subject to the terms and conditions of the Modified Bidder Agreements, the Debtors shall be, and hereby are, authorized and directed to sell, transfer, assign and deliver the Assets to the Purchasers free and clear of any and all Encumbrances, subject to the payment by the Purchasers of the purchase price (the "**Purchase Price**") and the assumption by the Purchasers of the assumed liabilities (the "**Assumed Liabilities**") as set forth in the Combined Offer and in the Modified Bidder Agreement of each Purchaser.  The Debtors are authorized to execute and deliver all documents (both before and after the Modified Closing) and to take all appropriate actions necessary to evidence and consummate the Modified Closing on the sale of the Assets to the Purchasers and the transactions contemplated thereby, including entering into a management agreement with Partners Imaging for such period of time as is necessary (but not to exceed sixty (60) days) for Partners Imaging to obtain its billing provider agreements and provider numbers from the applicable governmental agencies; provided, however, that (i) such management agreement shall not include any provision that adversely affects the Debtors or their estates, either on a monetary or a non-monetary basis, as reasonably determined by the Debtors and the Committee and their respective counsel, and (ii) the failure of the Debtors to execute such management agreement shall not be a condition to the Modified Closing under the Partners Imaging Offer or the Modified Bidder Agreement of Partners Imaging or affect any of the provisions of this Order regarding the forfeiture of the Partners Imaging Deposit.

7.      The transfer of the Assets to the Purchasers will be a legal, valid, and effective transfer of the Assets and will vest the Purchasers with all right, title and interest in and to the Assets, free and clear of all Encumbrances of any kind or nature whatsoever, other than the Assumed Liabilities, including, but not limited to (i) those that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal, or termination of the Debtors' or the Purchasers' interest in the Assets, or any similar rights, (ii) those relating to taxes arising under or out of, in connection with, or in

any way relating to the operation of the Assets prior to the Modified Closing, and (iii) (A) all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, rights of setoff, demands, encumbrances, rights of first refusal, or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership, and (B) all debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors and Encumbrances, including those arising under doctrines of successor liability, other than the Assumed Liabilities.

8.      At the Modified Closing, each of the Purchasers shall pay or deliver the Purchase Price (less any deposit being held by SRBP as described above in this Order (hereinafter, a "**Purchaser Deposit**")) into escrow with SRBP.  SRBP shall deposit the Purchase Price received from each Purchaser into a separate non-IOTA interest bearing account on behalf of the applicable Debtor(s) (hereinafter referred to, individually, as a "**Trust Account**" and, collectively, as the "**Trust Accounts**").  At the Modified Closing, SRBP shall be authorized to deposit each of the Purchaser Deposits into the applicable Trust Account to be applied against the applicable Purchase Price.  In the event a Modified Closing does not occur with respect to a Purchaser, SRBP shall be authorized to disburse the Purchaser Deposit for such Purchaser as described above in this Order. SRBP shall not be authorized to disburse any funds from the Trust Accounts, except as provided in this Order as to the Amegy Allowed Claim or as provided in a subsequent order of the Court.

9.      Notwithstanding anything to the contrary contained in this Order or in the Sale Motion, there shall be no allocation among the Debtors of the Purchase Price or the proceeds from the collection of any accounts receivable, until such time as the Court enters an order on a motion filed by the Debtors, the Committee, any representative appointed for the Debtors' estates under

Section 1123 of the Bankruptcy Code, or any trustee appointed in these cases regarding such allocation, which motion shall be served on all creditors of the Debtors.

10.     Following the Sale Hearing, and except as set forth in the next sentence, SRBP is authorized to return a deposit to any bidder who was not a winning bidder at the Sale Hearing.  The Court shall defer ruling on the return of ASDI's $50,000 deposit or the payment of the $50,000 break-up fee to ASDI, until such time as the Court enters an order on a motion filed by the Debtors or ASDI regarding such matters.  All parties reserve all rights regarding the foregoing.

11.     The Encumbrances securing the claims of any secured creditors against the Assets and any and all claims of the Equipment Companies with respect to the Identified Equipment shall attach to the proceeds that are in the Trust Accounts from the sale of such Assets, to the same extent, validity and priority as existed on such Assets and Identified Equipment as of the Petition Date.  The Debtors, the Committee, any representative appointed for the Debtors' estates under Section 1123 of the Bankruptcy Code, or any subsequently appointed trustee in these cases reserve all rights, claims and defenses against the holders of such Encumbrances, including the ability to challenge the extent, validity, priority or perfection of any such Encumbrances.

12.     If any person or entity that has filed financing statements or other documents or agreements evidencing Encumbrances on or in the Assets (including Encumbrances noted on certificates of title as to any vehicles or equipment, including the Identified Equipment, owned by the Debtors) shall not have delivered to the Debtors at or prior to the Modified Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of Encumbrances which the person or entity has with respect to the Assets, the Debtors or the Purchasers, as the case may be, are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with

respect to the Assets.  The Purchasers are hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances in or on the Assets of any kind or nature whatsoever.

13.     The Debtors and the Purchasers have acted in good faith, the terms and conditions of the Combined Offer and the Modified Bidder Agreements are fair and reasonable and have been negotiated and agreed upon in good faith on the part of the Debtors and the Purchasers, and each of the Purchasers is an arm's length purchaser who is purchasing the Assets in good faith and not an insider of the Debtors.  The Purchase Price constitutes reasonably equivalent and fair market value under the Bankruptcy Code and applicable non-bankruptcy law.  Accordingly, the Purchasers shall be entitled to all of the protections afforded by Section 363(m) of the Bankruptcy Code.

14.     On the Modified Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Assets and a bill of sale transferring good and marketable title in the Assets to the Purchasers free and clear of all Encumbrances.  Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Modified Bidder Agreements.

15.     Any real estate, personal property or other taxes related to the Assets accruing prior to the Modified Closing Date shall be the responsibility of the Debtors.  The Purchasers shall take title to the Assets subject to real estate, personal property or other taxes (excluding income taxes) relating to the Assets accruing on and after the Modified Closing Date and shall indemnify the Debtors with respect thereto.  Upon the consummation of the Modified Closing on the purchase of the Assets, any taxing authorities or governmental agencies having jurisdiction over the Assets shall

have no further claim against the Debtors or the estates for taxes (excluding income taxes) accruing on or after the Modified Closing Date.

16.     The Debtors shall not be liable for, and no portion of the Purchase Price shall be disbursed for, any brokerage commissions or finder's fees with respect to the sale of the Assets, except for the fees due to Berenfeld Capital Markets LLC ("**Berenfeld Capital**") pursuant to this Court's Order Approving Joint Emergency Application of Debtors and the Official Committee of Unsecured Creditors for Retention of Berenfeld Capital Markets LLC as Financial Consultants and Advisors dated December 7, 2009 [Doc. No. 379]. Berenfeld Capital shall not be paid any such fees absent application to and approval of this Court. The Purchasers shall not be liable for any brokerage commissions or finder's fees with respect to the sale of the Assets, including any fee due to Berenfeld Capital.

17.     The notice given by the Debtors of the Motion, the First Supplement, the Sale Objection Deadline, the Bid Deadline, the Credit Bid Deadline, the Competing Bid Procedures, and the Sale Hearing complied with the Bankruptcy Code, the Bankruptcy Rules, the Bid Procedures Order, and the Local Rules of this Court.

18.     Any creditor, prospective purchaser, Potential Bidder, or other party in interest that did not file and serve, on or before the Sale Objection Deadline, a written objection to the Sale Motion or the sale contemplated by the Purchase Agreement shall be, and hereby is, conclusively deemed to have waived any objection it may have to the Sale Motion or the sale of the Assets to the Purchasers and to have released all Encumbrances in or on or with respect to the Assets, with such Encumbrances attaching to the proceeds of the sale as described elsewhere in this Order.

19.     With the sole exception of any obligations of any Purchaser under its Modified Bidder Agreement or this Order, including the Assumed Liabilities, such Purchaser does not and

shall not be deemed to, pursuant to its Modified Bidder Agreement or otherwise, assume, agree to perform, or pay any Encumbrances, liabilities, claims, debts or obligations of the Debtors.  Each of the Purchasers shall not be, nor shall it be deemed to be, a successor or successor in interest to the Debtors by reason of any theory of law or equity, and each of the Purchasers shall not have any successor or transferee liability of any kind or character.

20.    Each of the Purchasers shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Assets other than as expressly set forth in this Order and in its Modified Bidder Agreement and the Assumed Liabilities.  Without limiting the effect or scope of the foregoing, the transfer of the Assets from the Debtors to the Purchasers does not and will not subject the Purchasers or their affiliates, successors or assigns or their respective properties (including the Assets) to any liability for any Encumbrances or claims against the Debtors or the Assets by reason of such transfer or otherwise under the laws of the United States or any state, territory or possession thereof applicable to such transactions.  Neither the Purchasers nor their affiliates, successors or assigns shall be deemed, as a result of any action taken in connection with the purchase of the Assets, to: (a) be a successor to the Debtors; (b) have, de facto or otherwise, merged with or into the Debtors; or (c) be a continuation or substantial continuation of the Debtors or any enterprise of the Debtors.  Neither the Purchasers nor their affiliates, successors or assigns is acquiring or assuming any liability, warranty or other obligation of the Debtors, including, without limitation, any tax incurred but unpaid by the Debtors prior to the Modified Closing Date, including, but not limited to, any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, fixed or audited, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction, except as otherwise expressly provided in this Order or in the Modified Bidder

24

Agreements and the Assumed Liabilities. Accordingly, the sale of the Assets to the Purchasers shall be free and clear of all Encumbrances to the fullest extent allowed under applicable law and equity, all of which Encumbrances shall attach to the proceeds of the sale as described elsewhere in this Order.

21.     The terms and provisions of this Order shall be binding upon the Debtors and their estates, creditors and stakeholders, the Purchasers, the Objecting Parties, the Equipment Companies, all parties to the Designated Leases, all parties to executory contracts and leases to be rejected or otherwise not assumed by the Debtors, and all other parties in interest and the respective successors and assigns of each of the foregoing (all of the foregoing whether known or unknown), including any trustee subsequently appointed for or on behalf of the Debtors under the Bankruptcy Code in these Chapter 11 cases or upon a conversion to Chapter 7.

22.     The Objection filed by the Ricciardello Estate has been resolved as described above in this Order and, accordingly, the Objection filed by the Ricciardello Estate is hereby overruled in all respects.

23.     The Objection filed by HCI, having been withdrawn by HCI at the Sale Hearing as described above, and any other oral objections raised by HCI at the Sale Hearing are hereby overruled in all respects. The terms of the HCI Offer as described above in this Order are approved in all respects and the Debtors are authorized to consummate the sale transaction with HCI.

24.     The Objection filed by Amegy, having been withdrawn by Amegy at the Sale Hearing as described above, is hereby overruled in all respects. The terms of the allowance and payment of the Amegy Allowed Claim as described above in this Order are approved in all respects and the Debtors are authorized to consummate such transaction with Amegy.

25.     For the reasons described above in this Order and as announced on the record at the Sale Hearing, the GECC Objection is overruled in all respects.

26.     The Court will conduct a future hearing, prior to the Modified Closing Date, to determine whether the patient privacy procedures of each of the Purchasers are consistent with the patient privacy procedures currently utilized by the Debtors.

27.     The Debtors are authorized to retain and collect the accounts receivable owned by the MRI Debtors and, if HCI does not close under the HCI Offer, to retain and collect the accounts receivable owned by the Axcess Debtors.

28.     The granting of the Sale Motion as set forth herein shall not constitute the approval of any plan of reorganization or liquidation for the Debtors.

29.     The 14-day stays set forth in Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure are hereby waived, for good cause shown, and this Order shall be immediately enforceable and the Modified Closing under each of the Modified Bidder Agreements may occur immediately following the entry of this Order.

30.     The Debtors shall not be required to file the statement with the Court as described in Bankruptcy Rule 6004(f)(1), but shall, upon request, provide the U.S. Trustee with copies of all closing documents under the Modified Bidder Agreements following the Modified Closing.

31.     The failure specifically to include any particular provision of the Modified Bidder Agreements in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Modified Bidder Agreements be authorized and approved in their entirety.  To the extent there is any inconsistency between the provisions of this Order and the terms of any Modified Bidder Agreement or the Sale Motion or any plan confirmed in these cases or any

order confirming such plan or any other order entered in these cases, the provisions of this Order shall control.

32.    This Court shall retain jurisdiction (a) to interpret, implement and enforce the provisions of this Order, (b) as to the Excluded Assets and the collection of the accounts receivable owned by the MRI Debtors and, if HCI does not close, the collection of the accounts receivable owned by the Axcess Debtors, and (c) to enforce and implement the terms and provisions of the Modified Bidder Agreements, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith in all respects, including, but not limited to, retaining jurisdiction to (i) subject to the terms and conditions of the Modified Bidder Agreements, compel delivery of the Assets to the Purchasers or the performance of other obligations of the Debtors under the Modified Bidder Agreements and each of the agreements executed in connection therewith, (ii) compel delivery of the Purchase Price by the Purchasers or the performance of other obligations of the Purchasers under the Modified Bidder Agreements and each of the agreements executed in connection therewith, including (without limitation) the timely payment of the Assumed Liabilities, (iii) resolve any disputes arising under or related to the Modified Bidder Agreements and each of the agreements executed in connection therewith, and (iv) resolve any dispute regarding the validity, extent and/or priority of any alleged Encumbrance attaching to the proceeds of the sale of the Debtors' Assets; provided, however, that in the event the Court abstains from exercising or declines to exercise such jurisdiction or is without jurisdiction with respect to the Modified Bidder Agreements or each of the agreements executed in connection therewith or this Order, such abstention, refusal or lack of jurisdiction shall have no effect upon, and shall not control, prohibit or

limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

**DONE** and **ORDERED** in Chambers at Tampa, Florida, on February 11, 2010 _____.

_____

CARYL E. DELANO
United States Bankruptcy Judge